UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SHONTE RUCKER,

                Plaintiff,

      - against -

NANCY A. BERRYHILL,

                Defendant.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**

16-CV-1388 (RRM) (SMG)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Shonte Rucker brings this action against defendant Carolyn Colvin,[1] Acting Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42 U.S.C. §§ 423(d)(1), (3), (5). Rucker seeks review of the determination that she is not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Rucker maintains that the Commissioner's determination is not supported by substantial evidence and is contrary to law. Both Rucker and the Commissioner have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Def.'s Mem. (Doc. No. 17); Pl.'s Mem. (Doc. No. 15).) For the reasons set forth below, Rucker's motion is denied, and the Commissioner's motion is granted.

## BACKGROUND

### I.      Procedural History

Rucker filed an application for DIB on July 26, 2013, alleging disability as of June 29, 2012, due to pain in her shoulder, spine, and neck. (Admin. R. at 9, 38, 263.) The application was denied on November 8, 2013, and Rucker requested a hearing before the Administrative

---

[1] Carolyn Colvin is no longer the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the current Acting Commissioner, Nancy Berryhill, is substituted as the proper defendant.

Law Judge ("ALJ") to review her application.  (*Id*. at 119–20, 121–24.)  ALJ Michael D. Cofresi

held hearings on November 10, 2014, February 2, 2015, and August 11, 2015.[2]  (*Id*. at 55–117.)

At the hearings on November 10, 2014, and February 2, 2015, Rucker testified and was

represented by counsel.  (*Id*. at 88–117.)  At the hearing on August 11, 2015, medical expert

Chaim Eliav, M.D., and vocational expert Mr. Maisie[3] testified.  (*Id*. at 55–87.)  On October 1,

2015, ALJ Cofresi issued a decision that Rucker did not qualify for DIB because there are a

significant number of jobs in the national economy that Rucker could perform.  (*Id*. at 35–50.)

On January 16, 2016, the ALJ's decision became final when the Appeals Council denied

Rucker's request for review.  (*Id*. at 1–6.)  This action followed.

## II.     Administrative Record

### a.     Non-Medical Evidence and Self-Reported Evidence

Rucker was born on January 20, 1968.  (Admin. R. at 244, 259, 332.)  She completed

high school, and can speak, understand, and read English.  (*Id*. at 262–64.)  At the time of the

November 10, 2014 hearing, Rucker was age 46 and lived with her 12-year-old daughter.  (*Id*. at

108, 113, 259, 332.)  She previously worked as a janitor with the New York City Housing

Authority, and as a clerical worker for a temp agency.  (*Id*. at 287–90.)  On June 29, 2012, while

working as a janitor, a recycling bin lid fell on Rucker's right shoulder and injured her.  (*Id*. at

109, 259, 263.)

In the disability report dated September 10, 2013, Rucker indicated that she had stopped

working as of June 29, 2012, due to the pain in her right shoulder.  (*Id*. at 263.)  She described

daily pain in her shoulder, neck, and back that radiates to her arms and legs.  (*Id*. at 273, 281–

---

[2] Multiple hearings were held in this case in order to provide Rucker adequate time to collect additional medical
records that she testified about, but were not originally included in the record before the ALJ.

[3] The vocational expert's first name is not provided in the record.

82.)  Rucker is unable to carry or lift heavy items, and is unable to lift her arms over her head. (*Id*. at 274.)  Additionally, Rucker stated that she cannot stand or sit for long periods of time without pain, and requires assistance from her daughter to accomplish tasks such as doing laundry, washing the dishes, and cleaning the house.  (*Id*. at 275–78.)  Still, on a typical day, Rucker gets her daughter ready for school, goes to therapy, watches television, and makes it outside.  (*Id*. at 274–76.)  She prepares meals with her daughter, and shops for food, clothes, and household items.  (*Id*. at 276–78.)  She socializes and visits her aunt's house several times a week.  (*Id*.)  In September 2013, Rucker also noted on a function report that when she is in pain, she takes Tramadol "three times a day as needed," and Hydrocodone-Ibuprofen three times a day as well.  (*Id*. at 282.)  Rucker indicated on the report that these medications do not relieve her pain, but make her drowsy, which interferes with her ability to complete tasks.  (*Id*. at 280, 282.)

About one year and a half after the recycling bin incident, on January 20, 2014, Rucker reported that she was in a separate, non-work-related car accident, which exacerbated her previous symptoms.  (*Id*. at 449.)  At the November 2014 hearing, she testified that she was unable to do most things and always had to have someone with her.  (*Id*. at 109.)  Rucker also testified that she was unable to reach and bend due to the pain in her neck and shoulder, and also suffered from migraines.  (*Id*. at 111–12.)  Rucker estimated that she was able to be on her feet for 10 to 15 minutes maximum.  (*Id*. at 111.)  In terms of treatment, Rucker indicated that she saw Michael Hearns, M.D., and Matthew Clark, M.D., every six weeks, saw Dr. Tyorkin for her shoulder, and had plans to see Dr. Gillingham for her neck pain.  (*Id*. at 113–14.)  Rucker attended physical therapy two to three times a week, saw a chiropractor, and received acupuncture treatment.  (*Id*. at 110.)  Rucker reported that she had received epidural steroid injections in her back and shoulder.  (*Id*. at 98–101.)  She also indicated that she had

prescriptions for Vicodin, Amrix, Celebrex, Tramadol, and Cyclobenzaprine. (*Id*. at 112.) Rucker also claimed it would be difficult to go back to work because her medications make her "a little more drowsy." (*Id.* at 111.)

At the February 2015 hearing, Rucker testified that "every now and then" it is difficult for her to raise her arm, and that she continued to experience pain in her right arm, as well as numbness on the pinky side. (*Id*. at 92–93.) She also continued to attend physical therapy, where they administered electroshock therapy and acupuncture. (*Id*. at 93.) She stated that she had also received an injection in her shoulder. (*Id.* at 98.)

### b.  Medical Evidence Prior to Rucker's Alleged June 29, 2012 Onset Date

On May 5, 2012, Rucker visited the Babylon Medical Offices in North Babylon, New York, and saw Rebecca Trojic, M.D., for a cough and general cold symptoms. (*Id*. at 410–11.) Dr. Trojic assessed that Rucker had an upper respiratory infection, and prescribed a "zpak," promethazine with codeine, and over-the-counter treatments. (*Id*.) Rucker returned to see Dr. Trojic on June 5, 2012, after she was recalled for abnormal lab results. (*Id*. 412–13.) Dr. Trojic found some evidence of prediabetes and hyperlipidemia in accordance with Rucker's lab results. (*Id*.) Dr. Trojic also noted that Rucker was recently seen at the emergency room for dizziness, and was given Meclizine, which made Rucker drowsy. (*Id*. at 413.) Dr. Trojic also observed that Rucker experienced shortness of breath with exertion, and that Rucker's walk was wobbly or unsteady. (*Id*. 412–13.)

### c.  Medical Evidence After Rucker's Alleged June 29, 2012 Onset Date

#### i.  Rebecca Trojic, M.D., (June 2012 – September 2012)

After the recycling bin incident on June 29, 2012, Rucker visited the Babylon Medical Offices in North Babylon, New York on July 2, 2012, for a Workmen's Compensation

examination.  (Admin. R. at 414.)  Rebecca Trojic, M.D., conducted the initial evaluation, and noted Rucker's reports of right shoulder and right upper arm pain at the sites of the trauma, as well as pain in her upper back.  (*Id*. at 414.)  Rucker also reported her pain level as severe – a seven or eight on a scale of one to ten.  (*Id*.)  Dr. Trojic described Rucker as alert, and noted her normal gait.  (*Id*. at 415.)  Dr. Trojic advised Rucker to ice the affected areas.  (*Id*.)  She also prescribed Cyclobenzaprine and Naprosyn, and instructed Rucker to rest until July 4, 2012, and to return to work on July 5.  (*Id*.)  An x-ray of Rucker's chest taken that same day showed no abnormalities.  (*Id*. at 428.)  Radiographs of Rucker's right humerus and right shoulder were also performed, and neither revealed evidence of acute fracture, dislocation, or loss of alignment.  (*Id*. at 430–33.)

Rucker returned to Babylon Medical Offices to see Dr. Trojic on July 27, 2012, and described her pain as excruciating, at level 10.  (*Id*. at 416.)  Dr. Trojic again described Rucker as alert and oriented, but noted a limited range of motion in her neck and shoulders, concentrated on the right side.  (*Id*. at 416.)  Dr. Trojic noted Rucker's continued pain in her neck and right shoulder, and directed Rucker to continue with her medications, and to begin physical therapy.  (*Id*.)  Upon her next visit, on September 28, 2012, Rucker again rated her pain at level 10.  (*Id*. at 418.)  Dr. Trojic noted that Rucker was alert and oriented, was splinting in order to avoid neck movements, and found that Rucker's pain was aggravated by movement and by cold.  (*Id*. at 419.)  Dr. Trojic prescribed Tramadol three times a day as needed, and wrote that Rucker would continue her care from that point with Dr. Hearns.  (*Id*.)

### ii. Michael Hearns, M.D., Treating Physician (September 2012 – June 2015)

On September 21, 2012, Rucker saw Michael Hearns, M.D., at Central Medical Services of Westrock ("CMSW"). (*Id*. at 459–61.) Dr. Hearns determined that Rucker's prognosis was fair, and checked off on his narrative report that Rucker's limitations included lifting, pushing, pulling, carrying, reaching, handling, and repetitive motions. (*Id*. at 460.) Dr. Hearns marked Rucker's disability level as "total," prescribed physical therapy, and ordered magnetic resonance imaging ("MRI") and positron emission tomography ("PET"). (*Id*. at 461.) Rucker began physical therapy several days later on September 24, 2012. (*Id*. at 576–77.) On October 23, 2012, Rucker again visited Dr. Hearns, who noted Rucker's complaints of shoulder and neck pain, marked her prognosis as fair, and listed the same restrictions, but noted cold environments and humidity as additional restrictions. (*Id*. at 510–12.) Dr. Hearns once again marked Rucker's disability as total. (*Id*.)

A November 15, 2012 EMG of Rucker's upper extremities was performed at CMSW, in order to rule out cervical radiculopathy. (*Id*. at 691–95.) Testing did not reveal radiculopathy, peripheral neuropathy, or entrapment neuropathy. (*Id*. at 692.)

In a progress report dated October 16, 2013, Dr. Hearns wrote that Rucker was unable to return to work. (*Id*. at 446–47.) On February 20, 2014, Rucker underwent MRIs of her cervical spine and brain at the offices of Dr. Hearns. (*Id*. at 506–09.) Test results from the cervical spine MRI revealed disc herniation at C4-5 and C5-6, deforming the thecal sac and abutting the spinal cord, as well as disc bulges at C2-3 and C3-4, as well as cervical spine straightening. (*Id*. at 508–09.) Test results from the brain MRI revealed faint punctate signal hyperintensity within the left deep periventricular white matter, which can indicate mild changes related to

microvascular disease or migraine headaches.  (*Id*. at 506–07.)  An electrodiagnostic study performed on April 1, 2014, revealed mild acute left-sided radiculopathy.  (*Id*. at 696–701.)

On August 28, 2014, Rucker returned to Dr. Hearns at CMSW and reported pain and stiffness in her neck and right shoulder, as well as intermittent headaches.  (*Id*. at 640–41.)  Dr. Hearns noted that Rucker was still awaiting authorization for right shoulder surgery.  (*Id*. at 641.)  Upon examination, Dr. Hearns noted pain in Rucker's neck.  (*Id*. at 640.)  Dr. Hearns advised Rucker to continue her Celebrex, Amrix, and Vicodin prescriptions, and additionally prescribed Hydrocodone.  (*Id*. at 641.)  At the next examination on October 9, 2014, Rucker again reported neck and shoulder pain and intermittent headaches.  (*Id*. at 652–55.)  Dr. Hearns also marked that Rucker's neck and shoulder pain worsened in cold weather.  (*Id*. at 652.)  He again advised Rucker to continue her current medications and found that she was still awaiting authorization for shoulder surgery.  (*Id*. at 653.)

In a narrative report dated October 12, 2014, Dr. Hearns reported his accumulated observations of Rucker over the treatment period starting September 21, 2012 and ending October 9, 2012.  (*Id*. at 518–23.)  He also reviewed Rucker's medical records from Dr. Trojic, Dr. Tyorkin, Dr. Gbolahan Okubadejo, and Dr. Richard Pearl.[4]  (*Id*. at 521–22.)  Dr. Hearns concluded that Rucker's diagnoses included right shoulder rotator cuff tear, right shoulder impingement syndrome, cervical herniated nucleus polpusus, cervical radiculopathy, and chronic lower back pain syndrome.  (*Id*. at 522.)  Dr. Hearns further assessed that Rucker's condition – particularly her chronic pain syndrome, inability to walk or stand for long periods, and poor concentration – would severely interfere with her ability to perform the essential duties of a job.  (*Id*. at 523.)  He found that, even with job modifications, Rucker would have anticipated

---

[4] Dr. Okubadejo and Dr. Pearl are mentioned in Dr. Hearns' narrative report but are not mentioned elsewhere in the record, and the record does not reflect any evidence of their treatment of Rucker.

absences and disruptive sleeping habits that would interfere with her ability to function reliably in any role. (*Id*.) Dr. Hearns listed Rucker's medications in his narrative report, but did not report any accompanying side effects. (*Id*. at 518–23.)

Within Dr. Hearn's functional assessment completed on the same day, he recorded that Rucker could stand and/or walk less than four hours a day, sit less than two hours a day, and could not lift or carry more than five pounds. (*Id*. at 516–17.) He additionally assessed that Rucker required periods of bed rest during the work day, required frequent breaks, and would require an average of two or more sick days off of work each month. (*Id*. at 517.) Dr. Hearns also found that Rucker suffered pain that prevented her from working an eight-hour day, and checked a box noting that her medications interfered with her ability to function. (*Id*.) Based on the above information, Dr. Hearns concluded that Rucker was unfit to perform in any position within the U.S. job market. (*Id*. at 522.)

On December 11, 2014, Dr. Hearns reexamined Rucker, noted that she was awaiting shoulder surgery approval, and advised her to continue her current medications. (*Id*. at 592–94.) Dr. Hearns saw Rucker again on January 22, 2015, and advised that she continue her medications, and additionally prescribed Neurontin at 100 milligrams. (*Id*. at 601–02.) On April 15, 2015, Rucker returned to CMSW and saw a physician's assistant, Cristina Comparetto. (*Id*. at 705–06.) Comparetto noted a limited range of motion in Rucker's neck, tenderness in her right shoulder, positive Hawkins and impingement tests, and decreased sensations and strength. (*Id*.) On June 11, 2015, Rucker returned to CMSW and was examined by Dr. Hearns. (*Id*. at 703–04.) He again advised Rucker to continue her medications, including Amrix and Neurontin, and referred Rucker to see a neurologist. (*Id*. at 704.)

### iii. Matthew Clarke, M.D., Pain Medication Specialist (October 2012 – July 2014)

On October 16, 2012, Rucker saw Matthew Clarke, M.D., a pain medication specialist. (*Id*. at 475.) Dr. Clarke diagnosed Rucker with right shoulder and right arm contusions and listed that her neck was affected as well. (*Id*. at 475–76.) Additionally, Dr. Clarke marked Rucker's prognosis as guarded, and her restrictions as including climbing and reaching, as well as lifting, pushing, pulling, and carrying over five pounds. (*Id*. at 476.) Dr. Clarke ordered an MRI, advised her to continue her pain medications, and referred her to an orthopedist. (*Id*.) After an MRI performed on October 21, 2012, test results revealed a partial tear of the rotator cuff and acromioclavicular hypertrophic changes associated with impingement syndrome. (*Id*. at 496–97.) There was no evidence of facture or dislocation. (*Id*.)

Rucker next saw Dr. Clarke on December 12, 2012, who again marked Rucker's prognosis as guarded, and listed generally the same restrictions. (*Id*. at 387–88.) Dr. Clarke marked Rucker's disability at 100 percent, checked the box indicating that her medication impacted her functional abilities, and prescribed Flexeril and Vicoprofen. (*Id*. at 388.) On January 30, 2013, Rucker saw Dr. Clarke, whose diagnoses remained unchanged. (*Id*. at 606–09.)

On January 18, 2013, Dr. Clarke ordered an MRI of Rucker's cervical spine. (*Id*. at 499–500.) Rucker's MRI results demonstrated disc herniation at C4-5 and C5-6, deforming the thecal sac and abutting the spinal cord at C4-5. (*Id*.) The same test revealed a disc bulge at C2-3, and cervical spine straightening. (*Id.*)

Rucker returned to Dr. Clarke on April 24, 2013. (*Id*. at 372–73.) Dr. Clarke diagnosed a right shoulder impingement and cervical radiculopathy, and recommended the continued use of

Motrin and Skelaxin. (*Id*.) In a progress note dated June 19, 2013, Dr. Clarke maintained Rucker's diagnosis as right shoulder impingement and cervical radiculopathy. (*Id*. at 620–26.) Dr. Clarke found a decreased range of motion, marked her prognosis as guarded, and continued to advise the same physical restrictions. (*Id*. at 621–22.) Upon Rucker's request for stronger medication, Dr. Clarke prescribed Tramadol at 50 mg twice per day, and recommended continued use of Skelaxin and Ibuprofen. (*Id*. at 622.) Dr. Clarke again recorded Rucker's disability as being at 100 percent. (*Id*.)

Rucker next saw Dr. Clarke on July 31, 2013. (*Id*. at 463–68.) Upon Rucker's request, Dr. Clarke gave her a referral to consult about possible spinal surgery. (*Id*. at 463–64.) Rucker returned to Dr. Clarke's offices on September 11, 2013, and informed Dr. Clarke that she no longer wished to do spinal surgery. (*Id*. at 466–74.) Dr. Clarke prescribed Celebrex and Amrix, and advised Rucker to continue acupuncture. (*Id*. at 464.) Dr. Clarke continued to note Rucker's disability as being at 100 percent, and reported that she could not return to work due to the pain of her condition. (*Id*. at 464.)

At a follow-up appointment with Dr. Clarke on October 23, 2013, Rucker reported that she was considering shoulder surgery. (*Id*. at 483–89.) Dr. Clarke found Rucker's prognosis to be guarded and that she had a total temporary disability. (*Id*. at 484.) Dr. Clarke continued Celebrex and Amrix, and advised the same physical restrictions. (*Id*.) Rucker returned to see Dr. Clarke on January 22, 2014. (*Id*. at 449–54.) Rucker reported that she had injured her neck and left shoulder in a car accident on January 20, 2014, and Dr. Clarke diagnosed right shoulder impingement and a herniated cervical disc, exacerbated by the motor vehicle accident. (*Id*. at 449.) Dr. Clark also noted a positive Hawkins sign in the right shoulder, and advised Rucker to continue her Celebrex and Amrix prescriptions. (*Id*. at 484.)

Dr. Clarke performed another examination on April 16, 2014, and noted that Rucker was awaiting approval for right shoulder surgery. (*Id*. at 610–13.) He observed reduced range of motion, including lateral rotation of the neck limited to 60 degrees, and advised Rucker to continue use of Celebrex and Amrix. (*Id*. at 610–11.) Dr. Clarke also prescribed Vicodin. (*Id*.) Rucker's prognosis was again marked as guarded. (*Id*. at 611.) Dr. Clarke reexamined Rucker on May 28, 2014, recorded Rucker's continued complaints of neck and shoulder pain, and noted reduced strength in Rucker's arms. (*Id*. at 614–19.) Next, on July 16, 2014, Dr. Clarke examined Rucker, noted that she was still not approved for shoulder surgery, and advised that she continue her Celebrex, Amrix, and Vicodin prescriptions. (*Id*. at 627–33.) Dr. Clarke found that Rucker's disability was total as it related to her job, but was an 80 percent disability overall. (*Id*. at 628.) He again noted that she could not return to work due to the pain of her condition. (*Id*.)

### iv.  Mikhail Kogan, M.D., Pain Management Specialist (December 2012 – May 2013)

On December 3, 2012, Rucker saw a pain management specialist, Mikhail Kogan, M.D. (*Id*. at 385–86.) Upon physical examination, Dr. Kogan noted that Rucker was alert and oriented, could walk without assistance, and had a steady gait. (*Id*. at 385.) He also noted stiffness and muscle spasm in Rucker's neck, as well as severe tenderness, and a significant decrease in Rucker's range of motion. (*Id*.) Dr. Kogan did not observe any motor or sensory deficit. (*Id*.) In examining Rucker's right shoulder, he found a decreased range of motion, as well as pain and tenderness. (*Id*. at 384.) Dr. Kogan referred Rucker for an MRI of her neck. (*Id*.)

Dr. Kogan reevaluated Rucker on March 11, 2013, and found that Rucker's October 2012 MRI revealed results consistent with a partial tear of the rotator cuff and acromioclavicular hypertrophic changes.  (*Id*. at 685–86.)  He also observed Rucker's spine MRI, and noted C4-5 and C5-6 disc herniation, deforming the thecal sac and abutting the spinal cord at C4-5.  (*Id*. at 686.)  Dr. Kogan found that the test results confirmed diagnoses of cervical disc herniation and radicular pain, right shoulder pain, and right shoulder tendinopathy.  (*Id.*)  He recommended Rucker as an excellent candidate for a trial of cervical epidural steroid injections, and administered the first injection on March 19, 2013.  (*Id.* at 370–71, 686.)

On April 19, 2013, Dr. Kogan examined Rucker and noted that she was alert and oriented, could walk without assistance, and had a steady gait.  (*Id*. at 374–75.)  Rucker had a decreased range of motion in the right shoulder with abduction, and tested positive for impingement.  (*Id*.)  Dr. Kogan diagnosed cervical disc herniation and cervical radicular pain, as well as right shoulder pain and tendinopathy.  (*Id*. at 374.)  He recorded that Rucker had a good trial of physical therapy and chiropractic manipulation, and had benefitted from the cervical epidural injection.  (*Id*. at 375.)  Dr. Kogan ultimately recommended Rucker as a good candidate for a second epidural injection, which he performed on April 23, 2013.  (*Id*. at 375, 683–84.)

On May 2, 2013, Rucker returned to Dr. Kogan, who noted Rucker's poor response to the epidural steroid injections.  (*Id*. at 376.)  Dr. Kogan wrote that Rucker did not benefit much from the injections, and that the next treatment should be manipulation under anesthesia.  (*Id*.)  He further noted that if Rucker failed this procedure, surgery should be considered.  (*Id*.)

### v.  Maxim Tyorkin, M.D., of CMSW (May 2013 – June 2013)

On May 3, 2013, Rucker saw Maxim Tyorkin, M.D., of CMSW.  (*Id*. at 687–88.)  Dr. Tyorkin examined Rucker and found a decreased range of motion in forward elevation and

abduction, along with right shoulder pain radiating into the neck.  (*Id*. at 687.)  Dr. Tyorkin

diagnosed right shoulder supraspinatus syndrome, cervical radiculopathy, and lumbar

radiculopathy.  (*Id*.)  Aside from activity modification, physical therapy, anti-inflammatories,

and pain management, Dr. Tyorkin administered a right shoulder subacromial injection.  (*Id*. at

687–88.)  Rucker followed up with Dr. Tyorkin on June 14, 2013, and reported that the right

shoulder injection had not helped.  (*Id*. at 689–90.)  Dr. Tyorkin recommended a spinal surgery

consultation, and noted Rucker as "temporarily totally disabled."  (*Id*. at 689.)

### vi.     Jason Gallina, M.D., Orthopedic Surgeon (July 2013 – March 2015)

On July 23, 2013, Rucker underwent computed tomography ("CT") and computed

radiography ("CR") scans of her cervical spine upon referral by Jason Gallina, M.D., orthopedic

surgeon.  (*Id*. at 493, 498.)  The CT scan revealed evidence of a small to moderate-sized focal

midline disc herniation impinging on the anterior aspect of the dural sac at C4-5.  (*Id*. at 493.)

The CR scan demonstrated straightening of the normal lordotic curvature of the cervical spine

due to muscular strain or spasm.  (*Id*. at 498.)

Rucker saw Dr. Gallina on December 8, 2014, and reported neck and right radiating arm

pain, as well as numbness and paresthesias, particularly in the fourth and fifth fingers of the right

hand.  (*Id*. at 585–89.)  Rucker also reported headaches, and Dr. Gallina noted that Rucker was

currently taking Skelaxin, and Hydrocodone-Ibuprofen.  (*Id*. at 585–86.)  Upon examination, Dr.

Gallina noted a limited range of motion in the cervical spine, and wrote that Rucker's gait

appeared asymmetrical and abnormal.  (*Id*. at 586–88.)  Dr. Gallina wrote that he and Rucker

discussed spinal surgery, and that Rucker would need a "C4-C5 ACDF" if she failed non-

operative treatment.  (*Id*. at 588.)  Dr. Gallina noted that Rucker would continue to consider this

option, and he recommended pain management, physical therapy, anti-inflammation medication, and pilates or yoga in the interim.  (*Id*.)

Rucker then followed up with Dr. Gallina on January 26, 2015, and March 30, 2015.  (*Id*. at 580–84.)  On the January 26 visit, Dr. Gallina wrote that Rucker had received two epidural injections since her last visit, but that these injections exacerbated her symptoms.  (*Id*. at 580.)  He also noted that Rucker did not want any additional injections.  (*Id*. at 583.)  At the March 30 visit, Dr. Gallina noted that Rucker did not want surgery, and again reported that she did not want additional injections.  (*Id*. at 707–11.)  The physical examination performed by Dr. Gallina on March 30 revealed generally unchanged results.  (*Id*.)

### vii.     Morton Finkel, M.D., Neurologist (June 2015)

On June 27, 2015, Morton Finkel, M.D., a neurologist, examined Rucker and noted that her Neurontin prescription helped her pain, but that even one capsule a day made her sleepy.  (*Id*. at 702.)  Dr. Finkel directed Rucker to discontinue Neurontin and prescribed 25 miligrams of Topamax, three times a day, and up to 10 times a day as needed.  (*Id*.)

### d.     Consultative Medical Evidence

### i.     Salvatore Corso, M.D., Consultative Examiner (October 2012 – April 2013)

On October 25, 2012, Rucker saw Salvatore Corso, M.D., who performed an independent orthopedic evaluation for the Workmen's Compensation Board.  (*Id*. at 395–97.)  Dr. Corso recorded Rucker's complaints of right shoulder and neck pain, noted that she was taking Tramadol for the pain, and had last taken Tramadol six hours before the examination.  (*Id*.)  Upon examination of the right shoulder, Dr. Corso found Rucker's range of motion in forward elevation was 150 degrees, where 180 degrees is normal, and abduction was 140 degrees, where

150 degrees is normal. (*Id*.) Dr. Corso additionally noted right medial border scapula tenderness. (*Id*.) All other test results revealed normal findings. (*Id*.) Dr. Corso diagnosed Rucker with status post right shoulder sprain with partial rotator cuff tear, and advised that she continue physical therapy twice a week, followed by an orthopedic reevaluation in six weeks' time. (*Id*.) Dr. Corso noted mild-partial orthopedic disability, and found that she was able to return to work as long as she did not lift items over 30 pounds with her right arm. (*Id*.)

Dr. Corso reevaluated Rucker for the Workers' Compensation Board on January 17, 2013. (*Id*. at 389–91.) Dr. Corso noted that since Rucker's last visit, she had received physical therapy three times per week, and took Cyclobenzaprine. (*Id*. at 389.) Upon examination of the right shoulder, Dr. Corso found a limited range of motion. (*Id*. at 390.) All other tests revealed normal results. (*Id*.) Dr. Corso found that there was no medical necessity for further orthopedic treatment, including physical therapy, and found that Rucker was able to return to work in her usual occupation without restrictions. (*Id*. at 391.)

On April 11, 2013, Dr. Corso conducted another independent examination for the Workers' Compensation Board. (*Id*. at 392–94.) Dr. Corso noted that since his last evaluation, Rucker had received a spinal epidural injection, and continued to receive physical therapy and chiropractic treatment. (*Id*. at 392.) Rucker told Dr. Corso that she takes Hydrocodone and Skelaxin, and Dr. Corso noted that she had not taken any medication for pain that day. (*Id*.) Upon examination of the cervical spine, Dr. Corso observed a limited range of motion during certain maneuvers, as well as right paracervical tenderness and muscle spasms. (*Id*. at 393–94.) Additionally, Dr. Corso noted normal muscle strength, an absence of sensorial deficits or neurotrophic changes, along with handgrip, pinch, and grasp at normal strength. (*Id*.) Reevaluation of Rucker's right shoulder revealed the same limitations in range of motion

recorded at prior appointments, and no tenderness.  (*Id*. at 394.)  Dr. Corso diagnosed status post right shoulder sprain with partial rotator cuff tear, and cervical radiculopathy.  (*Id*. at 685–86.)

### ii.   Joyce Graber, M.D., Consultative Examiner (September 2013)

On September 25, 2013, Rucker saw Joyce Graber, M.D., who conducted an examination for the Division of Disability Determinations.  (*Id*. at 435–38.)  Dr. Graber noted that Rucker was able to walk five or six blocks outside before she needed to stop, and listed Rucker's current medications as Celebrex, Amerax, and Tramadol, as needed.  (*Id*. at 435.)  In terms of general appearance, Dr. Graber found that Rucker's gait was normal, and that she could walk, squat, stand, and rise from her chair without difficulty.  (*Id*. at 436.)  Dr. Graber additionally noted that Rucker did not need assistance changing for the exam, or getting on and off the exam table.  (*Id*.)  Upon examination, Dr. Graber noted limited range of motion in the spine and right shoulder.  (*Id*. at 437.)  Dr. Graber ascribed Rucker's diagnosis as fair, and found that she had a mild limitation for reaching and other such activities.  (*Id*.)

### e.   Medical Expert Testimony

At the hearing before the ALJ on August 11, 2015, Chaim Eliav, M.D., summarized Rucker's medical records and testified as a medical expert.  (*Id*. at 57–87.)  Dr. Eliav testified that Rucker suffered from deficits in function, and would be limited to standing two hours per day, and to sitting six to eight hours per day.  (*Id*. at 61.)  Dr. Eliav also opined that Rucker would be limited to lifting 10 pounds using both arms and could only do so occasionally, but could lift five pounds frequently with one hand.  (*Id*. at 61–62.)  He asserted that Rucker could only bend, climb stairs, and reach beyond the horizontal plane on an occasional basis, and that she could not crawl, climb ladders, or be on platforms or scaffolds.  (*Id*.)  Upon reviewing Rucker's MRIs and other tests, Dr. Eliav testified that there was no evidence of impingement on

her spinal cord, or any evidence of a significant neurological defect that would mandate further

limitations on Rucker.  (*Id*. at 63–66.)  Dr. Eliav also testified that, in his opinion, Rucker's

medications would not cause her to be off-task, and noted that Rucker had been on very small

doses of Neurontin and Topomax.  (*Id*. at 68–70.)  He acknowledged that Rucker was prescribed

hydrocodone, and previously had taken Vicodin.  (*Id.* at 75, 76.)  He noted that on March 30,

2015, Rucker, who was already taking hydrocodone, denied having any headaches, dizziness,

visual changes, pain in her eyes, or hearing loss.  (*Id.* at 77.)

  **f.**  **Vocational Expert Evidence**

  Mr. Maisie testified as a vocational expert at the hearing held on August 11, 2015.  (*Id*. at

79–86.)  The ALJ detailed Rucker's vocational characteristics and purported limitations.  (*Id*. at

80–83.)  Maisie testified that an individual with Rucker's limitations could perform her past

relevant work as a medical records clerk.  (*Id*. at 82.)  Additionally, Maisie found that an

individual with Rucker's limitations could perform the following sedentary unskilled work: order

clerk (DOT No. 209.567-014), with 90,574 jobs in the national economy; callout operator (DOT

No. 237.367-014), with 16,509 jobs in the national economy; and telephone quotation clerk

(DOT 237.367-046), with 87,419 jobs in the national economy.  (*Id*. at 82–83.)

**STANDARD OF REVIEW**

**I.**  **Review of Denial of Social Security Benefits**

  When reviewing the final determination of the Commissioner, the Court does not make

an independent determination about whether a claimant is disabled.  *See Schaal v. Apfel*, 134

F.3d 496, 501 (2d Cir. 1998).  Rather, the Court "may set aside the Commissioner's

determination that a claimant is not disabled only if the [ALJ's] factual findings are not

supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case . . . [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II. Eligibility Standard for Disability Insurance Benefits

To establish eligibility for DIB, an applicant must produce medical and other evidence of his disability. *See* 42 U.S.C. § 423(d)(5)(A). To be found disabled, the claimant must have been unable to work due to a physical or mental impairment resulting from "anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(1)(A). This impairment must have lasted or be expected to last for a continuous period of not less than 12 months. *Id.*; *see also Barnhart v. Walton*, 535 U.S. 212 (2002). Further, the applicant's medically determinable

impairment must have been of such severity that he is unable to do his previous work or, considering his age, education, and work experience, he could not have engaged in any other kind of substantial gainful work that exists in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).  In determining whether a claimant is disabled, the Commissioner engages in the following five-step analysis:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); 20 C.F.R. § 404.1520.  The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step.  *See Talavera*, 697 F.3d at 151.

## DISCUSSION

### I.     The ALJ Properly Followed the Five-Step Analysis

At step one, the ALJ determined that Rucker had not engaged in substantial gainful activity since her June 29, 2012 onset date.  (Admin. R. at 41.)  At step two, the ALJ found that

Rucker's right shoulder pain and neck pain with herniation satisfied the "severe impairment" inquiry. (*Id.*) The ALJ also found that Rucker's blood pressure did not constitute a severe impairment, and that her alleged borderline diabetes lacked the requisite documentation and as such, was a non-medically determinable impairment. (*Id.*) At step three, the ALJ found that none of Rucker's severe impairments, neither individually nor in combination, "meets or medically equals the severity of one of the listed impairments." (*Id.*)

Considering the record as a whole, as well as Rucker's subjective complaints, the ALJ concluded that Rucker had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR § 404.1567(a).[5] (*Id.* at 41–48.) Specifically, the ALJ found that Rucker was able to lift up to 10 pounds with both hands occasionally, up to five pounds with one hand frequently, and was capable of sitting for six hours and standing or walking continuously for two hours in an eight-hour day. (*Id.* at 41.) The ALJ also found that Rucker was able to occasionally reach above the horizontal plane, bend, and climb stairs, but could not kneel, crawl, climb, or use ladders or scaffolds. (*Id.*)

At step four, the ALJ concluded that Rucker was able to perform past relevant work as a medical records clerk, because that job – as performed – qualified as sedentary work. (*Id.* at 48.) The ALJ also found that Rucker would be unable to perform her past relevant work as a janitor. (*Id.* at 49.)

The ALJ then proceeded to step five, where he considered Rucker's age, education, work experience, RFC, and the vocational expert's testimony. (*Id.* at 49–50.) He found that Rucker can lift up to 10 pounds with both hands occasionally and up to five pounds with one hand

---

[5] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 CFR § 404.1567(a).

frequently; she can sit for six hours per day and stand or walk continuously for two hours; she

can occasionally reach above the horizontal plane and can occasionally bend and climb stairs.

(*Id.*)  Accordingly, the vocational expert testified, and the ALJ accepted, that Rucker could

perform work that exists in significant numbers in the national economy, and therefore, a finding

of "not disabled" was appropriate.  (*Id.*)

In reaching his RFC determination, the ALJ gave "great weight" to Dr. Eliav, who opined

that Rucker could occasionally lift 10 pounds using both arms, could frequently lift five pounds

with one hand, and was capable of sitting for six hours and standing or walking continuously for

two hours in an eight-hour day.  (*Id.* at 46, 61–62.)  He also stated that Rucker was able to

occasionally reach above the horizontal, bend, and climb stairs, but could not kneel, crawl,

climb, or use ladders or scaffolds.  (*Id.*)  Rucker does not challenge the ALJ's decision to give

great weight to Dr. Eliav's opinion.

## II.     The ALJ's Credibility Finding is Based on Substantial Evidence

Rucker argues only that the ALJ failed to adequately consider her subjective complaints

of adverse side effects caused by her medications.  (Pl.'s Mem. at 20.)  Rucker specifically

alleges that she repeatedly reported dizziness and drowsiness caused by her prescribed pain

medications, but the ALJ failed to consider her subjective statements regarding these side effects,

as well as their impact on her functional capacity.  (*Id.* at 21–22.)

A credibility finding by an ALJ is entitled to deference by a reviewing court "because

[the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor."  *Gernavage v.

Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995).  The ALJ must analyze the credibility of

a claimant as to her symptoms through a two-step test.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d

Cir. 2010).  The ALJ must first decide "whether the claimant suffers from a medically

determinable impairment that could reasonably be expected to produce the symptoms alleged."

*Id.* (citing 20 C.F.R. § 404.1529(b)). Next, if the ALJ determines that the claimant does have

such an impairment, he must consider "'the extent to which the claimant's symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence' of

record." *Id.* (quoting 20 C.F.R. § 404.1529(a) (alternations omitted)). When evaluating the

"intensity, persistence and limiting effects of symptoms, the Commissioner's regulations require

consideration of seven specific, *objective* factors . . . that naturally support or impugn *subjective*

testimony of disabling pain and other symptoms." *Dillingham v. Colvin*, No. 14-CV-105 (ESH),

2015 WL 1013812, at *5 (N.D.N.Y. Mar. 6, 2015).

These seven objective factors are (1) the claimant's daily activity; (2) the location,

duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating

or aggravating factors; (4) the type, dosage, effectiveness, and side effects of medication taken to

alleviate pain or other symptoms; (5) treatment, other than medication; (6) other measures the

claimant receives for relief of her symptoms; and (7) other facts concerning the claimant's

functional limitations and restrictions due to her symptoms. *Id.* at *5 n.22 (citing 20 C.F.R. §§

404.1529(c), 416.929(c)). "While it is 'not sufficient for the ALJ to make a single, conclusory

statement that' the claimant is not credible or simply recite the relevant factors, remand is not

required where 'the evidence of record permits [the Court] to glean the rationale of the ALJ's

[credibility] decision.'" *Cichocki v. Astrue*, 534 F. App'x 71, 76 (quoting *Mongeur v. Heckler*,

722 F.2d 1033, 1040 (2d Cir. 1983)). In such a case, "the ALJ's failure to discuss those factors

not relevant to [her] credibility determination does not require remand." *Id.*

Here, the ALJ properly followed the two-step process in considering Rucker's symptoms.

(Admin. R. at 42–48.) At step one, the ALJ determined that Rucker had medically determinable

impairments that could reasonably be expected to cause her alleged symptoms. (*Id.* at 43.) At step two, the ALJ found that Rucker was not entirely credible with regards to her statements about the intensity, persistence, and limiting effects of these symptoms. (*Id*.) Substantial evidence supports this conclusion. On September 25, 2013, Rucker reported that she engaged in a wide range of daily activities, including attending to her own personal needs, watching television, listening to the radio, reading, socializing with friends, and shopping. (*Id*. at 43, 274–78.) In addition, Rucker reported cooking several times a week, cleaning once per week, and doing laundry as needed. (*Id*.)

Though she claims that the ALJ failed to consider her medications' side effects, Rucker has, at times, denied experiencing dizziness, headaches, and other symptoms. (*Id*. at 47, 708.) At a majority of her medical appointments, Rucker did not report any side effects, (*id*. at 42–47) and most of Rucker's medical notes do not contain any complaints of drowsiness, dizziness, or other side effects caused by her pain medication prescriptions, (*id*. at 374–75, 384–86, 389–97, 416, 417–18, 435–38, 459–61, 475–76, 610–13). While Rucker attempts to explain these gaps in the record by claiming that she had not taken any pain medication immediately preceding her medical appointments, Rucker need not have been experiencing symptoms on the examination table in order to have reported them to her treating physicians, whom she saw on a regular basis. (Pl.'s Mem. at 20–22; Pl.'s Reply Mem. (Doc. No. 18) at 3.) During the course of over three years from the alleged onset date to the date of the ALJ's decision, Rucker only mentioned side effects on a few isolated occasions. (Admin. R. at 110, 132, 510–12, 606–09).

Rucker further contends that Dr. Clarke's treatment notes corroborate her alleged side effects, but this argument is ultimately unpersuasive. (Pl.'s Reply Mem. at 2.) While Dr. Clarke did consistently check a box stating that her medications impacted her functional abilities,

nowhere in these treatment notes did Dr. Clarke record complaints of drowsiness, dizziness, or any other side effects.  (Admin. R. at 368–69, 377–84, 387–88, 398–99, 463–76, 483–84, 490–91, 501–02, 620–21, 627–28, 634–35, 646–47, 656–57, 667–69, 676–77.)  In fact, Dr. Clarke continued to refill Rucker's same medications at the same dose.  (*Id*.)  His notes, then, do not reveal any medical basis for concluding that Rucker's medications interfered with her ability to function.

In addition, when Rucker did specifically mention fatigue as a side effect in her appointment with Dr. Finkel on June 27, 2015, he promptly switched her medication from 100 milligrams of Neurontin to 25 milligrams of Topamax, three times a day, and up to 10 times a day as needed.  (*Id*. at 702.)  Apart from this instance, the record is filled with recommendations from multiple doctors advising that she remain on her current medications, which suggests that Rucker did not complain of debilitating side effects.

Dr. Eliav testified that Rucker's initial dose of 100 mg of Neurontin was a very low dose, and would not cause side effects significant enough to impose a work-related limitation.  (*Id*.)  He also testified that when Rucker switched from Neurontin to Topamax, this dose would not result in limitations either.  (*Id*. at 46–47, 702.)  Ultimately, Dr. Eliav testified that Hydrocodone could possibly interact with Neurontin, but that multi-drug interaction was not possible at 100 milligrams.  (*Id*. at 46–47, 641.)  In so testifying, Dr. Eliav did not comment on whether Hydrocodone could interact with Rucker's prescription for Topamax at 25 milligrams three times daily.  (*Id*. at 46–47, 702.)  Nevertheless, Dr. Eliav testified that he took Rucker's subjective complaints very seriously when formulating his expert opinion, and nonetheless concluded that her subjective complaints did not give rise to any additional debilitating limitations.  (*Id*. at 69–72.)

To the extent that the record contains conflicting testimony on Rucker's side effects, the record contains substantial evidence sufficient to sustain the ALJ's determination. *See Veino*, 312 F.3d at 588. As detailed above, there is substantial evidence for the ALJ's determination that Rucker is not fully credible. *See Cage v. Comm'r of Soc. Sec*., 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence."); *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

## CONCLUSION

For the reasons stated herein, the Commissioner's cross-motion for judgment on the pleadings (Doc. No. 17) is granted, and Rucker's motion for judgment on the pleadings (Doc. No. 15) is denied. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.


SO ORDERED.


Dated:  Brooklyn, New York
      March 14, 2018

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge